UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re STATE STREET BANK AND TRUST   :   MDL No. 1945
CO. FIXED INCOME FUNDS              :
INVESTMENT LITIGATION                :
                                               :
—————————————————————

NING YU, On Behalf of Himself and All   :   Civil Action No. 1:08-cv-08235-RJH
Others Similarly Situated,             :   (Relates to MDL No. 1945)
                                             :
                      Plaintiff,   :   <u>CLASS ACTION</u>
                                             :
      vs.                                 :
                                         :
STATE STREET CORPORATION, et al.,   :
                                         :
                     Defendants.   :
                                         :
—————————————————————

PLUMBERS AND STEAMFITTERS UNION   :   Civil Action No. 1:08-cv-07934-RJH
LOCAL NO. 10 HEALTH & WELFARE     :   (Relates to MDL No. 1945)
FUND, Individually and on Behalf of All   :
Others Similarly Situated,             :
                                         :
                     Plaintiff,   :
                                         :
      vs.                                 :
                                         :
STATE STREET CORPORATION, et al.,   :
                                       :
                     Defendants.   :

———————————————————— x

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE CLASS ACTION SECURITIES COMPLAINTS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................. 1

II.   STATEMENT OF FACTS ..................................................................... 2

III.  ARGUMENT ........................................................................................ 4

    A.    The Standard Governing a Motion to Dismiss ..................................... 4

    B.    The Standard Governing Sections 11 and 12(a)(2) .............................. 5

    C.    Plaintiffs Adequately Allege that Defendants Misrepresented the Value of the Funds' Portfolio Securities ............................................... 7

          1.    Plaintiffs' Allegations of Overstated Fund Values Are Actionable ........... 7

          2.    The Bespeaks Caution Doctrine Does Not Insulate Defendants' Misrepresentations Concerning the Value of the Funds .......................... 10

          3.    Plaintiffs' Valuation Allegations Need Only Satisfy the Pleading Requirements of Fed. R. Civ. P. 8(a) ...................................... 11

    D.    Plaintiffs Adequately Allege that Defendants Misrepresented the Extent of the Funds' Exposure to Mortgage-Related Securities......................................... 14

          1.    The Registration Statements Did Not Reveal the Extent of the Funds' Holdings in Mortgage-Related Securities .................................... 14

          2.    The Registration Statements Did Not Adequately Reveal the Risks Associated with Mortgage-Related Securities ......................................... 17

    E.    Plaintiffs Adequately Allege that Defendants Misrepresented the Descriptions of the Funds.................................................................. 18

          1.    Defendants Misrepresented the Description of the Yield Plus Fund ........ 18

          2.    Defendants Misrepresented the Description of the Intermediate Fund ..................................................................................... 20

    F.    Plaintiffs Adequately Allege Misrepresentations in the Certifications of Defendants Ross and Swanson ....................................................... 21

    G.    Defendants Have Not Established that Their Loss Causation Affirmative Defense Will Prevail as a Matter of Law .......................................... 22

Page

H. Plaintiffs Adequately Allege that Defendants State Street, SSgA, Leahy, Ross, Swanson and the "Independent Trustees" Are Statutory Solicitors for the Purposes of Pleading a Section 12(a)(2) Claim..........................................25

I. Plaintiffs Have Pleaded Section 15 Control Person Claims................................29

IV. CONCLUSION ...........................................................................................................31

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................5

*Briarwood Investments Inc. v. Care Inv. Trust Inc.,*
   No. 07 civ. 8159(LLS), 2009 WL 536517
   (S.D.N.Y. Mar. 4, 2009) .................................................................................22

*Burch v. Pioneer Credit Recovery, Inc.,*
   551 F.3d 122 (2d Cir. 2008) .......................................................................5, 10

*Capri v. Murphy,*
   856 F.2d 473 (2d Cir. 1988) .....................................................................25, 27

*Clark v. Nevis Capital Mgmt., LLC,*
   No. 04 Civ. 2702(RWS), 2005 WL 488641
   (S.D.N.Y. March 2, 2005) ..............................................................................25

*Degulis v. LXR Biotechnology, Inc.,*
   928 F. Supp. 1301 (S.D.N.Y. 1996) ..............................................................26

*Garber v. Legg Mason, Inc.,*
   537 F. Supp. 2d 597 (S.D.N.Y. 2008) .............................................................6

*Goldstein v. Pataki,*
   516 F.3d 50 (2d Cir. 2008) ..............................................................................5

*Greenapple v. Detroit Edison Co.,*
   618 F.2d 198 (2d Cir. 1980) ............................................................................9

*Halperin v. eBanker USA.com, Inc.,*
   295 F.3d 352 (2d Cir. 2002) ..........................................................................10

*Herman & MacLean v. Huddleston,*
   459 U.S. 375 (1983) .........................................................................................6

*Hunt v. Alliance North American Gov't Income Trust, Inc.,*
   159 F.3d 723 (2d Cir. 1998) .............................................................. 19, 20, 21

*I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.,*
   936 F.2d 759 (2d Cir. 1991) ............................................................................6

**Page**

*In re AIG Advisor Group*,
  No. 06 CV 1625(JG), 2007 WL 1213395
  (E.D.N.Y. Apr. 25, 2007) ...............................................................................13

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) .............................................................14

*In re Alliance North American Gov't Income Trust, Inc. Sec. Litig.*,
  No. 95 Civ. 0330 (LMM), 1996 WL 551732
  (S.D.N.Y. Sept. 27, 1996) ..........................................................................19, 20

*In re Alstom SA Secs. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) .............................................................17

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) .............................................................14

*In re Charles Schwab Corp. Sec. Litig.*,
  No. C 08-01510 WHA, 2009 WL 262456
  (N.D. Cal. Feb. 4, 2009) ........................................................................*passim*

*In re CIT Group, Inc. Sec. Litig.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) ...........................................................9, 13

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) .......................................................................12

*In re Elan Corp.*,
  No. 02 Civ. 865 (RMB)(FM), 2004 WL 1305845
  (S.D.N.Y. May 18, 2004) ...............................................................................13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005) ...........................................................27, 28

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  411 F. Supp. 2d 377 (S.D.N.Y. 2006) ...............................................................5

*In re Gas Reclamation, Inc. Sec. Litig.*,
  733 F. Supp. 713 (S.D.N.Y. 1990) ..................................................................27

*In re IAC/InterActiveCorp Sec. Litig.*,
  478 F. Supp. 2d 574 (S.D.N.Y. 2007) ...........................................................5, 20

**Page**

*In re Indep. Energy Holders PLC Sec. Litig.*,
154 F. Supp. 2d 741 (S.D.N.Y. 2001) ........................................................28, 29

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..........................................................6, 30

*In re Keegan Mgmt. Co. Sec. Litig.*,
No. 91-20084 SW, 1991 WL 253003
(N.D. Cal. Sept. 10, 1991) ...................................................................................28

*In re Merrill Lynch & Co., Research Reports Sec. Lit.*,
289 F. Supp. 2d. 429 (S.D.N.Y. 2003) .................................................................25

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..................................................................22

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
Nos. 02 Civ. 6153(BSJ), 02 Civ. 8579(BSJ), 2009 WL 256005
(S.D.N.Y. Feb. 2, 2009) ........................................................................................22

*In re Philip Servs. Corp. Sec. Litig.*,
383 F. Supp. 2d 463 (S.D.N.Y. 2004) ..................................................................30

*In re Prudential Secs. Inc. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) .........................................................................11

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
441 F. Supp. 2d 579 (S.D.N.Y. 2006) ..................................................................25

*In re Scottish Re Group Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ..................................................................28

*In re Stratosphere Corp. Sec. Litig.*,
1 F. Supp. 2d 1096 (D. Nev. 1998) ......................................................................29

*In re Superior Offshore Int. Inc. Sec. Litig.*,
Civil Action No. H-08-0687, 2009 U.S. Dist. LEXIS 1535
(S.D.N.Y. Jan. 12, 2009) ........................................................................................6

*In re Turkcell Iletisim Hizmetler*,
202 F. Supp. 2d 8 (S.D.N.Y. 2001) ........................................................................6

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
382 F. Supp. 2d. 1173 (N.D. Cal. 2004) ..............................................................25

**Page**

*In re Westinghouse Sec. Litig.,*
   90 F.3d 696 (3d Cir. 1996) ................................................................................. 26, 29

*In re WorldCom, Inc. Sec. Litig.,*
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) .................................................................... 30

*In re WorldSpace Sec. Litig.,*
   No. 07 Civ. 2252 (RMB), 2008 WL 2856519
   (S.D.N.Y. July 21, 2008) ........................................................................................ 6

*Iqbal v. Hasty,*
   490 F.3d 143 (2d Cir. 2007) ................................................................................... 5

*Ladmen Partners, Inc. v. Globalstar, Inc.,*
   No. 07 Civ. 0976(LAP), 2008 WL 4449280
   (S.D.N.Y. Sept. 30, 2008) ..................................................................................... 13

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005) ............................................................................. 23, 24

*Levine v. AtriCure, Inc.,*
   508 F. Supp. 2d 268 (S.D.N.Y. 2007) .......................................................... 5, 22, 23

*Levine v. AtriCure, Inc.,*
   594 F. Supp. 2d 471 (S.D.N.Y. 2009) ................................................................ 5, 10

*Lin v. Interactive Brokers Group, Inc.,*
   574 F. Supp. 2d 408 (S.D.N.Y. 2008) ..................................................................... 5

*Mabon, Nugent & Co. v. Borey,*
   127 B.R. 727 (S.D.N.Y. 1991) .............................................................................. 28

*Milman v. Box Hill Sys. Corp.,*
   72 F. Supp. 2d 220 (S.D.N.Y. 1999) ..................................................................... 28

*Pinter v. Dahl,*
   486 U.S. 622 (1988) ...................................................................................... 25, 28, 29

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir. 2004) ........................................................................... *passim*

*Royal Am. Managers, Inc. v. IRC Holding Corp.,*
   885 F.2d 1011 (2d Cir. 1989) ................................................................................ 27

**Page**

*Sellin v. Rx Plus, Inc.*,
730 F. Supp. 1289 (S.D.N.Y. 1990) ..................................................................27

*Sula v. City of Watervliet*,
No. 1:06-CV-316 (NAM/DRH), 2006 WL 2990489
(N.D.N.Y. Oct. 19, 2006) ...............................................................................10

*Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..........................................................27, 28


STATUTES, RULES AND REGULATIONS

15 U.S.C.
§7l(2) ..............................................................................................................25
§77k ..........................................................................................................5, 12, 22
§77l..................................................................................................................22

Federal Rules of Civil Procedure
Rule 8(a) .......................................................................................................*passim*
Rule 9(b) ....................................................................................................11, 14
Rule 12(b)(6)........................................................................................................4

Plumbers and Steamfitters Union Local No. 10 Health & Welfare Fund ("PSU"), the lead plaintiff in Civil Action No. 1:08-cv-07934-RJH, and Anatoly Alexander ("Alexander" and, together with PSU, "Plaintiffs"), the lead plaintiff in Civil Action No. 1:08-cv-08235-RJH, submit this memorandum in opposition to: (1) State Street's Memorandum of Law in Support of Motion to Dismiss Class Action Securities Complaints ("Def. Mem."); and (2) the Independent Trustees' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaints, both dated March 11, 2009.[1]

## I.    INTRODUCTION

These actions allege that Defendants offered shares of two funds, the SSgA Intermediate Fund (the "Intermediate Fund") and the SSgA Yield Plus Fund (the "Yield Plus Fund" and, together with the Intermediate Fund, the "Funds"), to the public based upon registration statements and prospectuses that were materially false and misleading. Specifically, although the Funds were heavily invested in mortgage-related securities, and sub-prime mortgage-related securities in particular, Defendants' representations obfuscated and failed to disclose the extent of the risks relating to such securities that were ***already materializing*** both before and during each Class Period. As a result, the registration statements and prospectuses were materially false and misleading in three respects: they misrepresented the value of the Funds; the true extent of the exposure of the Funds to mortgage-related securities; and the general descriptions of the Funds.

---

[1]      "Plumbers Compl. ¶__" shall refer to the complaint in Civil Action No. 1:08-cv-07934-RJH. "Yu Compl. ¶__" shall refer to the complaint in Civil Action No. 1:08-cv-08235-RJH. "Compls. ¶__" shall refer to both complaints. "Defendants" shall refer, collectively, to State Street Corporation ("State Street"), State Street Global Advisors ("SSgA"), SSgA Funds (together, the "State Street Defendants"), and the individual defendants named in each Complaint (the "Individual Defendants"). *See* Compls. ¶¶11-20.

Because these actions assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), Plaintiffs need not allege either scienter or loss causation, and nothing in the Complaints alleges any intentional or even reckless conduct by Defendants. As a result, under Fed. R. Civ. P. 8(a), Plaintiffs need only present short and plain statements of their claims alleging material misrepresentations and omissions in the registration statements and prospectuses. As set forth below, the Complaints easily satisfy this requirement.

## II.    STATEMENT OF FACTS

Defendant State Street is one of the world's largest global financial services companies. Through its subsidiaries, State Street provides a range of products and services for investors worldwide. Compls. ¶6. Defendant SSgA is the investment management arm of State Street, and focuses on delivering investment strategies and integrated solutions to institutional and individual investors worldwide. Compls. ¶7. Defendant SSgA Funds engages in business as an open-end management investment company and is registered as such under the Investment Company Act of 1940. Compls. ¶8. Each of the Individual Defendants was, *inter alia*, either a trustee of SSgA Funds or an officer of the Funds.

On or about November 9, 1992, Defendants began offering shares of the Yield Plus Fund pursuant to an initial registration statement filed with the SEC. Yu Compl. ¶29. On or about September 1, 1993, Defendants began offering shares of the Intermediate Fund pursuant to an initial registration statement filed with the SEC. Plumbers Compl. ¶29. Defendants annually filed nearly identical Registration Statements and Prospectuses (the "Registration Statements") throughout the Class Period in connection with the continuous offerings of each Fund's shares. *See* Yu Compl. ¶30 (Registration Statements for the Yield Plus Fund); Plumbers Compl. ¶30 (Registration Statements for the Intermediate Fund).

Defendants marketed the Intermediate Fund as a conservative bond fund seeking "a high level of current income while preserving principal by investing primarily in a diversified portfolio of debt securities with a dollar-weighted average maturity between three and ten years." Plumbers Compl. ¶33. Defendants marketed the Yield Plus Fund as an alternative to a money market fund and compared the returns of the Yield Plus Fund to the J.P. Morgan 3-month LIBOR Index. Yu Compl. ¶33. The Registration Statements stated that the investment objective of the Yield Plus Fund was to seek high current income and liquidity by investing primarily in a diversified portfolio of "high-quality debt securities" and by "maintaining a portfolio duration of one year or less." *Id.*

The price of each Fund's shares, called the Net Asset Value ("NAV"), was computed each day by dividing the current represented value of the Fund's assets (less liabilities) by the number of shares of the Fund outstanding and rounding to the nearest cent. Compls. ¶34. The Complaints allege that the NAVs paid by each Class Member were inflated because Defendants failed to properly value the Funds' NAVs, and failed to timely write-down the troubled mortgage-related assets in the Funds' portfolios. Compls. ¶35

During the Class Periods, Defendants devoted a large portion of the Funds' investments to financial instruments that included "asset-backed securities" that overwhelmingly derived their value from home-equity loans, mortgage-backed securities, swaps, derivatives, and other exotic financial instruments, thereby materially increasing the Funds' overall exposure to the sub-prime mortgage market. Compls. ¶¶36-37. These high-risk investments directly exposed the Funds to the volatility of the sub-prime mortgage market at precisely the time it was being publicly reported that defaults of sub-prime mortgages were skyrocketing, and that numerous sub-prime lenders were facing insolvency. Thus, the Funds significantly *increased* their exposure to risky mortgage-related

- 3 -

securities at the same time the mortgage meltdown that caused an economic crisis in the United States was occurring.  Compls. ¶38.

Although the Registration Statements contained boilerplate disclosures concerning the risks of some mortgage-related securities, they did not disclose that numerous risks associated with those securities, and sub-prime mortgage-related securities in particular, ***were already materializing, and had begun to materialize even before the Class Periods***.  Those risks, discussed in the Complaints in detail at paragraphs 40-55, and in Section III.C.1 below, included:  a rising U.S. prime rate; a decline in property values; a significant increase in the U.S. mortgage default rate, particularly for sub-prime mortgage loans; a drop in the sales of existing homes, with a commensurate rise of homes on the market; late mortgage payments rising; and mortgage lenders revealing enormous losses and declaring bankruptcy.[2]

As a result of Defendants' failure to disclose the ongoing materialization of risks related to the sub-prime mortgage industry and mortgage-related securities, the Registration Statements were materially false and misleading in at least three respects.  The Registration Statements contained inaccurate and misleading information: (1) regarding the value of the Funds (*see* Section III.C below); (2) concerning the true extent of exposure of the Funds to mortgage-related securities (*see* Section III.D below); and (3) in their general descriptions of the Funds (*see* Section III.E below).

## III.   ARGUMENT

### A.    The Standard Governing a Motion to Dismiss

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable

---

[2]     Nor did they disclose that each Fund's listed "asset-back securities" were subject to these same purported risks.

inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008). Dismissal is appropriate "only if the plaintiff fails to provide factual allegations sufficient to raise a right to relief above the speculative level." *Id.* (internal quotation marks omitted) (citing *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). As this Court has written, *Twombly* requires only "'a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations *in those contexts where such amplification is needed to render the claim plausible*.'" *Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471, 474 (S.D.N.Y. 2009) (emphasis added) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 158 (2d Cir. 2007)).

**B.    The Standard Governing Sections 11 and 12(a)(2)**

Section 11 imposes liability on, *inter alia*, the issuer of a security, as well as any person who signed the registration statement and/or served as a director of the issuer or performed similar functions, if: the registration statement as of its effective date contained an untrue statement of a material fact; omitted to state a required material fact; or omitted to state a material fact necessary to make the statements therein not misleading. *See* 15 U.S.C. §77k(a); *see also Rombach v. Chang*, 355 F.3d 164, 168 n.2 (2d Cir. 2004). Similarly, Section 12(a)(2) holds any person liable who "offers or sells a security" by means of a materially false "prospectus or oral communication." 15 U.S.C. §77l(a)(2); *see also Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008).

To establish a *prima facie* claim under Section 11, a plaintiff "'need only plead a material misstatement or omission in the registration statement.'" *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007) (Holwell, J.) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006)). "A Section 11 violation is established when 'material facts have been omitted or presented in such a way as to obscure or distort their significance.'" *In re*

- 5 -

*IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 595 (S.D.N.Y. 2007) (Holwell, J.) (quoting *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)).  Under Section 11, "[l]iability against an issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *see also In re Superior Offshore Int. Inc. Sec. Litig.*, Civil Action No. H-08-0687, 2009 U.S. Dist. LEXIS 1535, at *7 (S.D.N.Y. Jan. 12, 2009) (sustaining Section 11 complaint and noting that Section 11 "contains liability provisions that are "expansive – creating 'virtually absolute' liability for corporate issuers for even innocent material misstatements").

"To establish a claim under Section 12(a)(2), 'a plaintiff must prove that (1) defendants sold or offered a security (2) by means of a prospectus (3) that included an untrue statement of material fact or omitted a material fact necessary to make such statements not misleading.'"  *In re WorldSpace Sec. Litig.*, No. 07 Civ. 2252 (RMB), 2008 WL 2856519, at *5 (S.D.N.Y. July 21, 2008) (quoting *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008)).

Neither Section 11 nor Section 12 requires pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made.  *See Rombach*, 355 F.3d at 169 n.4 ("Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action."); *accord In re Turkcell Iletisim Hizmetler*, 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001).

Furthermore, such claims are subject only to the notice pleading standards of Fed. R. Civ. P. 8(a), and a short and plain statement of the claim will suffice.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 342 (S.D.N.Y. 2003) (noting that a simply pled Section 11 claim will satisfy Rule 8(a), "just as the half-page model complaints in the Appendix to the Federal Rules of

Civil Procedure satisfy the pleading requirements of the Federal Rules").

    **C.**    **Plaintiffs Adequately Allege that Defendants Misrepresented the Value of the Funds' Portfolio Securities**

        **1.**    **Plaintiffs' Allegations of Overstated Fund Values Are Actionable**

The Complaints allege that the Funds "failed to properly value the NAV," Compls. ¶35, "fail[ed] to properly value [their] investments in mortgage-related securities," Compls. ¶59, "did not use the security's fair value," Yu Compl. ¶65; Plumbers Compl. ¶63, and were "unable to or otherwise failed to properly value the securities as represented," Yu Compl. ¶65; Plumbers Compl. ¶63. Defendants' claim that Plaintiffs plead no facts to support these allegations is flatly untrue. Def. Mem. at 21.

It is undisputed that Defendants took enormous write-downs related to their mortgage-related investments. As the Complaints allege: "Beginning in late 2007 and accelerating through the first quarter of 2008, and continuing throughout 2008, the Fund took massive write-downs as it belatedly marked the value of mortgage-related investments down to their reduced market values. Those write-downs caused a commensurate decline in the Fund[s'] NAV[s], which in turn resulted in losses to investors." Yu Compl. ¶76; Plumbers Compl. ¶74.[3] Thus, there is no question that, at some point, the value of the mortgage-related assets in the Funds' portfolios became inflated, leading to inflation in the value of the NAVs. The only question is one of timing: were those values inflated on the effective dates of the Registration Statements filed throughout the Class Periods? *See* Compls. ¶30.

---

[3]      During the fourth quarter of 2007, State Street set aside $625 million to cover legal claims arising from its inappropriate investments in mortgage-related securities, such as the investments by the Funds. Yu Compl. ¶82; Plumbers Compl. ¶79. On January 20, 2009, State Street announced that it took a $450 million charge in the fourth quarter of 2007 for the cost of protecting investors in its so-called "stable value accounts" managed by its SSgA unit as a result of problems with risky investments, including mortgage-related securities. Yu Compl. ¶87; Plumbers Compl. ¶82.

Plaintiffs have pleaded numerous facts demonstrating that the meltdown of the sub-prime mortgage industry and mortgage-related securities began prior to and continued throughout the Class Periods.  Specifically, Plaintiffs allege:

- that the U.S. prime interest rate, which had remained flat at four percent for more than a year, climbed steadily throughout 2005 and 2006 before reaching 8.25 percent in June 2006, Compls. ¶40;

- that U.S. property value appreciation began to slow significantly, and actually began to decline in several U.S. markets, during 2006, *id.* ¶41;

- that beginning in 2005, there was a "significant increase in U.S. mortgage default rates, particularly for sub-prime mortgage loans," *id.* ¶42;

- that no later than 2005, borrowers who were not required to verify their incomes were overstating them, *id.* ¶43;

- that in August 2006, sales of existing homes plunged 4.1% to a two-year low, prices stagnated, and the number of homes on the market soared to a 13-year high, *id.* ¶44;

- that by August 2006, more sub-prime borrowers were defaulting in the early months of their home loans, leading to greater fear among investors and lenders of rising delinquencies and losses, *id.* ¶45;

- that in August 2006, 115,292 properties entered into foreclosure (an increase of 24 percent above the level in July 2006 and 53 percent higher than a year earlier), according to an online marketplace for foreclosure sales, and that foreclosure rates in real estate bellweather states like Florida and California were especially high, *id.* ¶46;

- that sub-prime loans made in 2006 were "going bad" at a rate that was 50 percent faster than the rate for those made in 2005, *id.* ¶47; *see also id.* ¶48;

- that in the third quarter of 2005, late mortgage payments shot up as interest rates went higher, and sub-prime borrowers had a delinquency rate of 12.56 percent, the highest in more than three years, *id.* ¶49;

- that by early 2007, top mortgage lenders, such as HSBC, New Century Financial, Countrywide Financial, and Washington Mutual, started to reveal enormous losses and warn of future market losses, *id.* ¶¶50-51;

- that by March 2007, several lenders, including Fremont General Corporation and New Century Financial, exited the sub-prime residential real estate lending completely, *id.* ¶52;

- that on April 2, 2007, New Century Financial announced it was filing for Chapter 11 bankruptcy protection, *id.*;

- that, during the two Class Periods: (a) mortgage interest rates were trending higher; (b) home prices had stagnated and began to fall; (c) there was a dramatic rise in sub-prime mortgage loans delinquency rates; (d) there was a significant increase in early payment defaults on non-prime mortgage loans; and (e) sub-prime and Alt-A mortgage loan originators were closing or winding down business, *id.* ¶53; and

- that there were numerous published reports about non-prime loans being associated with rampant mortgage fraud, and that public indices, like the ABX Index, were indicating that sub-prime mortgage loan risk had increased dramatically, *id.* ¶54.

Yet, the Funds' NAVs remained steady and largely unchanged from their inception through the summer of 2007.  Yu Compl. ¶¶77-78; Plumbers Compl. ¶¶75-76.

Although these allegations plainly support Plaintiffs' claims that Defendants should have marked down the value of their mortgage-related assets, as well as the resulting NAV of each Fund, long before they began to do so in late 2007, Defendants argue that these allegations merely represent "20-20 hindsight," Def. Mem. at 23, and that "[t]he pleadings omit to state what fact was known and overlooked throughout a multi-year period that would inexorably lead to different pricing decisions at any specific point in time."  *Id.* at 24.

In fact, what Defendants "knew" or did not know is irrelevant to Plaintiffs' Sections 11 and 12(a)(2) claims, which can be based on negligent or even innocent conduct.  *See*, *e.g.*, *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 203 (2d Cir. 1980) ("Section 11 . . . imposes a form of strict liability for material misstatements or omissions of fact in registration statements"); *see also In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004) (same).  Thus, the issue is not what Defendants knew and overlooked, but rather: were the Funds' NAVs overstated in light of overvalued sub-prime mortgage assets in their portfolios, regardless of Defendants' knowledge?

The allegations set forth above establish an entirely plausible claim that the values in question were overstated as early as 2005 and throughout the Class Periods, and should have been

written down much earlier.  That is all that the law requires.  *See*, *e.g.*, *Burch*, 551 F.3d at 124 (dismissal is appropriate "only if the plaintiff fails to provide factual allegations sufficient to raise a right to relief above the speculative level") (internal quotation marks omitted); *AtriCure, Inc.*, 594 F. Supp. 2d at 474 (a pleader need only "amplify a claim with some factual allegations *in those contexts where such amplification is needed to render the claim plausible*'") (emphasis added) (internal quotation marks omitted).  Because Plaintiffs' claim that Defendants failed to timely mark down overstated mortgage-related asset values is more than plausible, Plaintiffs should be given an opportunity to present their claims and engage in both fact and expert discovery.  *See*, *e.g.*, *Sula v. City of Watervliet*, No. 1:06-CV-316 (NAM/DRH), 2006 WL 2990489, at *3 (N.D.N.Y. Oct. 19, 2006) ("Thus, the question at this pleading stage is not whether plaintiff has presented evidence in support of his claims, but whether he has stated legally viable claims to afford him the opportunity to discover and present evidence in support of his complaint.").

### 2.   The Bespeaks Caution Doctrine Does Not Insulate Defendants' Misrepresentations Concerning the Value of the Funds

Defendants cite the "bespeaks caution" doctrine to argue that the misrepresentations Plaintiffs allege concerning the Funds' NAVs cannot be material because Defendants had already disclosed the risk.  Defendants rely on *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), which states:

> Under the bespeaks caution doctrine, 'alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'

*Id.* at 173 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)). Defendants ignore, however, the Second Circuit's important *caveat* to the bespeaks caution doctrine, that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the

risk has transpired." *Id.* (quoting *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)).

The so-called "cautionary" language on which Defendants rely is wholly boilerplate. According to the Prospectus for the Funds filed with the SEC on December 18, 2006 (the "2006 Prospectus"): "There can be no assurance that the Funds' net asset value fairly reflects security values as of the time of pricing when using the Fair Value Procedures to price the Funds' securities." Def. Mem. at 25-26 (quoting 2006 Prospectus at 59).[4] This language fails even to acknowledge the valuation risks alleged in the Complaints (and set out in detail in the previous section) that were *already* occurring. For example, the 2006 Prospectus fails to address the significant increase in U.S. mortgage default rates that began in 2005, particularly for sub-prime mortgage loans. *See* Compls. ¶¶40-49.

Because Defendants' boilerplate cautions failed to disclose the materialization of specific risks alleged in the Complaints, the bespeaks caution doctrine does not support Defendants' motion to dismiss.

### 3. Plaintiffs' Valuation Allegations Need Only Satisfy the Pleading Requirements of Fed. R. Civ. P. 8(a)

Although Fed. R. Civ. P. 8(a)(2) requires a complaint to contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," Defendants argue that Plaintiffs' valuation allegations are "grounded in fraud," and therefore must comply with the particularity requirements of Rule 9(b). Def. Mem. at 26. While Plaintiffs' Complaints *do* allege – as Section 11 requires – that Defendants made untrue statements, *nowhere* do they allege fraudulent, knowing, or

---

[4]     The 2006 Prospectus is attached as Exhibit A to the Declaration of Robert A. Skinner in Support of State Street's Motion to Dismiss Class Action Securities Complaints ("Skinner Decl."), dated March 11, 2009.

even reckless misrepresentation.   Consequently, Plaintiffs need only satisfy the pleading requirements of Rule 8(a)(2).

Section 11 permits certain persons to sue when a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. §77k(a).  Section 12(a)(2) has nearly identical language relating to a "prospectus or oral communication."  15 U.S.C. §77l(a)(2).  To plead a claim under Section 11 or 12(a)(2), therefore, a complaint must include terms that are ordinarily associated with fraud, such as "untrue" and "misleading."  Thus, one cannot infer an allegation of scienter simply because the complaint alleges "untrue" or "misleading" statements.  A Section 11 claim ***must*** contain such allegations to survive a motion to dismiss.  *See* 15 U.S.C. §77k(a).[5]

Defendants base their contention that Plaintiffs' valuation allegations are "grounded in fraud" on the statement in each Complaint that the Fund in question "was unable to or otherwise failed to properly value the securities ***as represented***."  *See* Yu Compl. ¶65; Plumbers Compl. ¶63 (emphasis added); *see also* Def. Mem. at 27.  Although Defendants claim that Plaintiffs' use of the phrase "as represented" alleges "knowing and intentional conduct," Def. Mem. at 27, that is simply not the case.  Plaintiffs do not allege that the failure in question was anything other than negligent or even innocent, and the use of the term "represent" does not transform the allegation into one of fraud.  *See, e.g.*, *In re Daou Sys., Inc.*, 411 F.3d 1006, 1028 (9th Cir. 2005) (allegations of "innocent or

---

[5]      As noted, Plaintiffs allege claims under Sections 11, 12(a)(2), and 15 of the Securities Act, which do not require an allegation of scienter.  *See* Section III.B above; *see also Rombach*, 355 F.3d at 169 n.4 ("Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action.").  Plaintiffs do ***not*** allege claims under Section 10(b) of the Securities Exchange Act, which ***does*** require such an allegation.

negligent misrepresentation" are "at the heart" of a §11 claim); *In re Elan Corp.*, No. 02 Civ. 865 (RMB)(FM), 2004 WL 1305845, at *11 (S.D.N.Y. May 18, 2004) (confirming that Section 11 claims can arise from negligent misrepresentations).

As a fallback, Defendants argue: "At a minimum, the plaintiffs' allegations – that defendants consistently and repeatedly ignored available evidence suggesting that the Funds were overvaluing mortgage-related securities throughout the three-year putative class periods – suggest a deliberate indifference or reckless misrepresentation of the facts in the Registration Statements." Def. Mem. at 27. While Plaintiffs *do* allege facts demonstrating that the Registration Statements were misleading and incomplete, nowhere do they claim Defendants' conduct was willful or reckless, or that Defendants willfully or recklessly "ignored" "red flags." Indeed, neither of those terms even occurs in either Complaint.

Thus, this case is very different from those relied upon by Defendants, in which the complaints alleged unambiguously fraudulent misconduct. *See*, *e.g.*, *In re AIG Advisor Group*, No. 06 CV 1625(JG), 2007 WL 1213395, at *13 (E.D.N.Y. Apr. 25, 2007) (complaint alleged "secretive and culpable acts," such as a "clandestine, incentive-driven culture among AIG's brokerage arm to sell Shelf-Space Funds," and "undisclosed kickbacks"); *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976(LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008) (finding the complaint "riddled with allegations of essentially fraudulent conduct," including a deliberate scheme to withhold information from investors); *CIT Group*, 349 F. Supp. 2d at 690 n.4 (plaintiffs alleged that defendants knew the company did not have adequate reserves at the time they reported those reserves were adequate).

Absent such allegations, the Complaints need only satisfy the pleading requirements of Rule 8(a)(2), which they unquestionably do. The Complaints allege that the relevant Registration

Statements misrepresented the description of the Funds, the valuation of the Fund, and the Funds' exposure to risky, mortgage-related securities.  *See*, *e.g.*, Yu Compl. ¶¶58-72; Plumbers Compl. ¶¶58-70.  They also allege that, as a result of the misrepresentations, Plaintiffs were harmed.  *See*, *e.g.*, Yu Compl. ¶95; Plumbers Compl. ¶90.  That is all that Rule 8(a)(2) requires.[6]

> **D.     Plaintiffs Adequately Allege that Defendants Misrepresented the Extent of the Funds' Exposure to Mortgage-Related Securities**

Plaintiffs allege that the Registration Statements misrepresented the true extent of their exposure to mortgage-related securities, and sub-prime mortgage-related securities in particular, by failing to adequately disclose both the extent of the Funds' holdings in those securities and the risks associated with those securities.   Yu Compl. ¶¶67-72, Plumbers Compl. ¶¶65-70.   Although Defendants claim that the Registration Statements "as a whole" fully disclosed both, Def. Mem. at 18, they are incorrect.

> **1.     The Registration Statements Did Not Reveal the Extent of the Funds' Holdings in Mortgage-Related Securities**

In documents such as the Annual Report for the SSgA Funds Fixed Income Funds for the period ending August 31, 2006 (the "2006 Annual Report"),[7] Defendants grouped Fund securities by category, such as Asset-Backed Securities, Mortgage-Backed Securities, and International Debt, and

---

[6]      Should the Court determine that Plaintiffs' claims sound in fraud, and that the Complaints fail to satisfy the pleading requirements of Rule 9(b), Plaintiffs respectfully request permission either to replead their claims based on negligence or strict liability, or to allege additional facts to satisfy Rule 9(b).  *See*, *e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d, 474, 501 (S.D.N.Y. 2004) ("when faced with a §11 claim that sounds in fraud but fails to meet the requirements of Rule 9(b), a court may dismiss the claim with leave to replead a §11 claim based on negligence or strict liability unless repleading would be futile"); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 516 (S.D.N.Y. 2005) ("[i]nvestors were entitled to replead the Securities Act and Securities Exchange Act claims that were dismissed for failure to plead fraud with sufficient particularity").

[7]      The 2006 Annual Report is attached as Exhibit C to the Skinner Declaration.

- 14 -

disclosed the percentage each group represented of total Fund holdings.  Yu Compl. ¶68, Plumbers Compl. ¶66.  Plaintiffs allege that, because some of the Funds' mortgage-related securities were grouped with categories *other* than Mortgage-Backed Securities (*e.g.*, Asset-Backed Securities and International Debt), Plaintiffs were misled as to the full extent of the Funds' holdings in those securities.  *Id.*

Defendants do not contest that some mortgage-related securities were grouped with other categories.  Def. Mem. at 19.  Instead, they try to defend that practice by arguing that "[s]ecurities backed by home equity loans and other similar mortgage-related assets fit squarely within the Prospectuses' definition of 'asset-backed securities.'"  *Id.* at 19.  In fact, however, the definition of "asset-backed securities" in the 2006 Prospectus not only fails to mention mortgage-related securities, but excludes them by inference.  The definition states (in relevant part): "Asset-backed securities are securities whose principal and interest payments are collateralized by pools of assets such as *auto loans*, *credit card receivables*, *leases*, *installment contracts* and *personal property*."  Skinner Decl. Ex. A at 43 (emphasis added).  Securities collaterized by pools of *mortgages* are conspicuously absent from the list.  Moreover, the 2006 Prospectus's discussion of Asset-Backed Securities specifically refers to mortgage-backed securities as a similar, but *separate*, category: "Like mortgage-backed securities, asset-backed securities are often subject to more rapid repayment that their stated maturity would indicate. . . ."  *Id.*  An investor could reasonably conclude from this language, and likely *would* conclude, that asset-backed securities do *not* include mortgage-related securities.

Perhaps anticipating this response, Defendants also argue that the individual securities were listed by category in the schedules to the Funds' 2006 Annual Report, and that the Asset-Backed Securities category included securities such as "Ameriquest Mortgage Securities, Inc." and "Asset

Backed Securities Corp. Home Equity," in which a mortgage-related word appears in the security's name.  Even this listing of individual securities, however, does not correct Defendants' other false and misleading statements.  First, not every mortgage-related security listed among the Asset-Backed Securities (or any other category) contains the word "mortgage," "home," or something similar.  For example, the 2006 Annual Report contains an entry for "Argent Securities, Inc." ("Argent") under the heading Asset-Backed Securities.  Skinner Decl. Ex. C at 8 (or 9).[8]  Although it is not obvious from the name (or from anything else in the 2006 Annual Report), Argent represents a pooling of home mortgages.[9]  There are numerous other examples of such securities.[10]  Accordingly, Plaintiffs are entitled to, and in fact must, rely on Defendants' categorization of the underlying investments and the percentages attributed to each group.

Tellingly, ordinary investors are not the only ones who are unable to determine which securities are mortgage-related based solely on their name.  When asked about the Funds' holdings (as listed in the 2006 Annual Report) at his recent deposition, James P. Kramer, currently U.S. Head

---

[8]     It is unclear from the exhibit where page 8 begins and ends.

[9]     *See* Exhibit A to the Declaration of Evan J. Kaufman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Class Action Securities Complaints ("Kaufman Decl."), dated April 6, 2009, submitted herewith.

[10]     The following securities, which do not contain the word "mortgage" or any similar term in the name, are a sampling of mortgage-related securities that are listed under a category *other* than Mortgage-Backed Securities:  Asset Backed Funding Certificates, which are categorized with Asset-Backed Securities (*see* Skinner Decl. Ex. C at 8 or 9; Kaufman Decl. Ex. B); Credit-Based Asset Servicing and Securitization, which is categorized with Asset-Backed Securities (*see* Skinner Decl. Ex. C at 8 or 9; Kaufman Decl. Ex. C); GSAMP Trust, which is categorized with Asset-Backed Securities and is not only mortgage-related but sub-prime related (*see* Skinner Decl. Ex. C at 8 or 9; Kaufman Decl. Ex. D); Encore Credit Receivables Trust, which is categorized with Long-Term Investments and is not only mortgage-related but sub-prime related (*see* Skinner Decl. Ex. C at 35; Kaufman Decl. Ex. E); Securitized Asset Backed Receivables LLC Trust, which is categorized with Long-Term Investments and is not only mortgage-related but sub-prime related (*see* Skinner Decl. Ex. C at 35; Kaufman Decl. Ex. F).

- 16 -

of Fixed Income Trading at State Street, and previously a Portfolio Manager there, testified that he did not have the "skill set" to "identify every bond and what the backing of the loans are just by viewing . . . the name of it." Kaufman Decl. Ex. G at 05:22:06 – 05:22:16. As Mr. Kramer testified, to determine the nature of the collateral backing the security, one would have to consult an information service for global financial markets such as the Bloomberg system. *Id.* at 05:19:45. Even as to those securities that *do* contain a term like "mortgage" in their name, it would not be obvious to the average investor whether or not the pooled mortgages included *sub-prime* mortgages. Indeed, it was not even obvious to Mr. Kramer: "I can see that some of them are just – are made up of . . . home loans. . . . I don't necessarily know if they're subprime or just flat out – straight-out home eq." Kaufman Decl. Ex. G at 5:25:03 – 05:25:16. This is precisely the reason why the securities are already classified by category in the various reports distributed to shareholders. Nevertheless, investors do not have an obligation to research or interpret information that may explain or clarify otherwise false or misleading statements by a defendant company. *See, e.g.*, *In re Alstom SA Secs. Litig.*, 406 F. Supp. 2d 433, 453 n.11 (S.D.N.Y. 2005) ("An investor should not be called upon to piece together buried information from distinct parts of financial statements in order to understand basic aspects of a company's finances.").

### 2.   The Registration Statements Did Not Adequately Reveal the Risks Associated with Mortgage-Related Securities

Defendants also argue that they cannot have misrepresented Plaintiffs' exposure to mortgage-related securities because the Registration Statements "as a whole disclosed . . . the attendant risks of these types of investments in a manner that could not mislead investors." Def. Mem. at 18. Defendants then reference some of the boilerplate cautionary language in the Registration Statements. *Id.* at 18-19.

- 17 -

This argument fails for the same reason their "bespeaks caution" argument fails: a boilerplate recitation of potential risks does not disclose the specific risks that had already come to pass.  For example, the 2006 Prospectus did not disclose any information concerning the significant increase in U.S. mortgage default rates, which began in 2005, particularly for sub-prime mortgage loans.  *See* Compls. ¶¶40-49.  Because the cautionary language did not disclose those risks, it cannot overcome Plaintiffs' claims.  *See also* Section III.C.1 above (setting out the risks that had already come to pass) and Section III.C.2 above (discussing Defendants' bespeaks caution defense).  Nor did it reveal that Asset-Backed Securities are not only subject to "asset-backed securities risk," but also, to a significant extent, to "mortgage-backed securities risk."  *See* pages 16, 17 and footnote 11, above.

### E.   Plaintiffs Adequately Allege that Defendants Misrepresented the Descriptions of the Funds

#### 1.   Defendants Misrepresented the Description of the Yield Plus Fund

Plaintiff Alexander alleges that Defendants' description of the Yield Plus Fund in the various Registration Statements was misleading.  Yu Compl. ¶¶58-60.  In particular, Alexander contests Defendants' representation that the Yield Plus Fund sought high current income and liquidity by investing in "a diversified portfolio of ***high-quality*** debt securities."  Yu Compl. ¶58 (emphasis added).  For all the reasons given in Sections III.C and III.D above, the Fund's mortgage-related securities, and especially its sub-prime mortgage-related securities, were ***not*** "high-quality."  Rather, they were subject to a host of risks that were materializing throughout the Class Period, but that were not disclosed in the Registration Statements.  Those risks, described in Section III.C above, include: a rising U.S. prime rate; a decline in property values; a significant increase in the U.S. mortgage default rate, particularly for sub-prime mortgage loans; a drop in the sales of existing homes, with a commensurate rise of homes on the market; late mortgage payments rising; and mortgage lenders revealing enormous losses and declaring bankruptcy.  *See* Yu Compl. ¶¶40-55.  Under these

circumstances, mortgage-related securities, and particularly sub-prime mortgage-related securities, cannot accurately be described as "high-quality."

Rather than address this argument, Defendants choose to misconstrue it.  Citing various spots in the 2006 Prospectus that specifically acknowledge the Yield Plus Fund's investment in mortgage-related securities, Defendants argue: "The [complaint's] claim that the Prospectuses' 'descriptions' tacitly excluded mortgage-related securities is thus empty."  Def. Mem. at 14.  In fact, plaintiff Alexander has never argued that the descriptions in question "exclude" any reference to mortgage-related securities.  To the contrary, the Yu Complaint quotes a passage that specifically mentions those securities.  Yu Compl. ¶58.  Rather, Alexander contests the quality and value of those securities in light of then-prevailing conditions – a subject Defendants do not even address.

Thus, this case is distinguishable from *Hunt v. Alliance North American Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), and the related lower court decision,[11] on which Defendants rely. In *Hunt*, the plaintiffs were shareholders in the Alliance North American Government Income Trust, Inc., an open-ended mutual fund formed to make investments in government-guaranteed securities of Mexico, Canada, the United States, and countries in Central and South America.  *Id.* at 724.  The plaintiffs alleged violations of the federal securities laws after the value of their shares declined dramatically due to the collapse of the Mexican peso in December 1994.  *Id.*  The lower court held that a "reasonable investor could not have been misled as to the Fund's intention to invest in Mexican . . . securities and the amounts that could be so invested," 1996 WL 551732, at *5, and the Second Circuit affirmed.  159 F.3d at 732.

---

[11]     The lower court decision is *In re Alliance North American Gov't Income Trust, Inc. Sec. Litig.*, No. 95 Civ. 0330 (LMM), 1996 WL 551732 (S.D.N.Y. Sept. 27, 1996).

- 19 -

By contrast, Alexander does *not* contend he was misled as to the Yield Plus Fund's intention to invest in mortgage-related securities. Rather, he alleges that he was misled because Defendants did not disclose the full extent of the risks associated with mortgage-related securities that *were materializing throughout the Class Period*. Further, as explained, Defendants did not disclose the full extent of the mortgage-related investments by the Fund. Defendants' failure to disclose those risks and the saturation of mortgage-related securities held by the Fund makes the Registration Statements misleading in violation of Sections 11 and 12(a)(2).

## 2. Defendants Misrepresented the Description of the Intermediate Fund

For all the reasons Defendants' description of the Yield Plus Fund was misleading, so was their description of the Intermediate Fund. Although their description of the Intermediate Fund does not specifically describe the portfolio of debt securities as "high quality," as did the description of the Yield Plus Fund, it *does* fail to disclose the numerous risks that were materializing throughout the Class Period. Plumbers Compl. ¶¶40-55. Without a disclosure of the full extent of these risks, investors could not evaluate other statements made by Defendants, such as their representation that "[f]und investments will primarily be in debt instruments rated investment grade or better." *Id.* ¶58. Whether or not a rating agency had technically rated the Fund's sub-prime mortgage-related securities as "investment grade," such a representation is misleading in the absence of a disclosure of the risks that are presently materializing concerning those same securities, and therefore violates Section 11 and Section 12(a)(2).[12] *See, e.g., IAC/InterActive*, 478 F. Supp. 2d at 596 ("A Section 11

---

[12]     PSU also alleges that Defendants' comparison of the Intermediate Fund to the more conservative and stable Lehman Brothers® Intermediate Government/Credit (LBIGC) Index was materially false and misleading. Defendants' reliance on *Hunt*, 159 F.3d at 730, is not to the contrary. Def. Mem. at 17. In *Hunt*, the Court found that the representation in question "purported only to compare the Fund's *returns* to those of the Lehman Brothers indexes." *Id.* (emphasis in

violation is established when 'material facts have been omitted or presented in such a way as to obscure or distort their significance.'").  Moreover, that some of the investments may have been investment grade would not neutralize Defendants' otherwise false and misleading statements.  It would only be relevant to some of the Defendants' affirmative defenses – issues that are not ripe for resolution at this time.

### F.    Plaintiffs Adequately Allege Misrepresentations in the Certifications of Defendants Ross and Swanson

Defendants argue that "there are simply no facts to support the allegation that the certifications made by defendants Ross and Swanson contained untrue statements of material fact." Def. Mem. at 29.  Defendants base this argument on the faulty premise that "the plaintiffs have insufficiently pled that defendants reported inflated NAVs for the Funds or inflated values for the Funds' mortgage-related securities," and that "plaintiffs have failed to state a claim for any material misrepresentations of the funds' investment objectives or holdings." *Id.*  Because, as demonstrated above, Plaintiffs have more than sufficiently alleged such claims, their claims based on the certifications are adequately pled, as well.

---

original).  The Court concluded that "[n]o reasonable investor could have viewed this chart as an exhaustive description of the Fund's *risks*." *Id.* (emphasis in original).  Here, by contrast, Defendants represented:  "The Fund seeks to match or exceed the return of the Lehman Brothers® Intermediate Government/Credit (LBIGC) Index *and to manage the Fund's duration to correspond to the LBIGC Index's duration while adding value through issue and sector selection*." Plumbers Compl. ¶58 (emphasis added).  By comparing the duration and issue and sector selection of the risk-laden Intermediate Fund with that of the far more conservative LBIGC Index, Defendants have gone much further than the defendants in *Hunt*.  A reasonable investor *could* understand Defendants to be representing the risk, issue and sector selection of the Intermediate Fund to be comparable to the LBIGC Index with minor variations.

**G.    Defendants Have Not Established that Their Loss Causation Affirmative Defense Will Prevail as a Matter of Law**

Loss causation is not an element of a Section 11 or 12(a) claim.  *See* 15 U.S.C. §77k; 15 U.S.C. §77l; *Levine*, 508 F. Supp. 2d at 272 (addressing Section 11); *Briarwood Investments Inc. v. Care Inv. Trust Inc.*, No. 07 civ. 8159(LLS), 2009 WL 536517, at *3 (S.D.N.Y. Mar. 4, 2009) ("A plaintiff is not required to plead 'loss causation' . . . to establish a prima facie claim under §§11 or 12(a)(2) of the Securities Act.")[13]   Instead, these statutory claims provide for a loss causation affirmative defense to liability.  *Levine,* 508 F. Supp. 2d at 272.  Significantly, "the burden of disproving loss causation falls on defendants, reflecting Congress's 'desire to allocate the risk of uncertainty to the defendants.'"  *Id.*  This Court has previously held that, unlike in a Section 10(b) action, "***plaintiffs have no obligation to plead or prove loss causation in §11 cases*** . . . ; ***rather, causation is presumed***."  *Id.* at 273 (citations omitted) (emphasis added).

The courts that have explicitly considered loss causation on a Section 11 or 12(a)(2) motion to dismiss have done so narrowly.  Such cases hold that when it is apparent on the face of the complaint that the plaintiff's loss cannot, under any circumstance, be causally related to the misconduct, a complaint may be dismissed.  *See, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003).  Plaintiffs submit that such cases are wrongly decided since they serve to improperly "invert[] the burden of proof" on an affirmative defense.  *Levine,* 508 F. Supp. 2d at 274.  Nonetheless, Plaintiffs have alleged the causal connection between Defendants' wrongful conduct and their losses.  More importantly, while Defendants may have an

---

[13]    The same analysis for pleading loss causation, set forth below, applies to both Section 11 and Section 12(a)(2).  *See, e.g., In re Morgan Stanley Tech. Fund Sec. Litig.*, Nos. 02 Civ 6153(BSJ), 02 Civ. 8579(BSJ), 2009 WL 256005, at *6 (S.D.N.Y. Feb. 2, 2009) ("The PSLRA added an affirmative defense [for claims arising under Section 12(a)] modeled after Section 11 of the Securities Act.").

arguable "negative causation" defense at a later point in this litigation, "the Complaint does not on its face negate the factual presumption of causation, as it must for defendant[s] to succeed at this early stage." *Id.*

In *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), the Second Circuit considered the issue of loss causation in ruling on the defendants' motion to dismiss claims brought under Section 10(b). The Court held: "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk ***concealed*** by the misrepresentations and omissions alleged by a disappointed investor." *Id.* at 173 (emphasis in original). While not necessary under the claims pled here, Plaintiffs have alleged just that.

For example, Plaintiffs allege that the description of the Funds contained in the Registration Statements concealed the extent to which the Funds were "heavily invested in risky mortgage-related assets and the risk of investing in the Fund[s] was significantly greater than represented." Yu Compl. ¶¶58-62; Plumbers Compl. ¶¶58-60. Plaintiffs also allege the values of the Funds were misrepresented because Defendants, among other things, failed to properly value and timely write-down the Funds' mortgage-related securities. Yu Compl. ¶¶63-66; Plumbers Compl. ¶¶61-64. Finally, Plaintiffs allege the Registration Statements concealed the true risks associated with the Funds and their heavy investment in mortgage-related securities. Yu Compl. ¶¶59, 67-72; Plumbers Compl. ¶¶65-70. Plaintiffs then allege the concealed risks materialized when Defendants belatedly wrote down the market value of the Funds' mortgage-related investments, causing "a commensurate decline in the Fund[s'] NAV, which in turn resulted in losses and caused investors to abandon the Fund." Yu Compl. ¶¶76-78; Plumbers Compl. ¶¶74-82. Nothing more is required to plead loss causation at this juncture.

The recent *Schwab* opinion is directly on point. In *Schwab*, the defendants argued that the Section 11 and 12(a)(2) claims against them should be dismissed for failure to plead loss causation. *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2009 WL 262456, at *5 (N.D. Cal. Feb. 4, 2009). Relying in part on *Lentell,* Judge Alsup expressly rejected an argument that is identical to the one made by Defendants here:

> Defendants reasoning is as follows. Plaintiffs are investors in a mutual fund rather than in an individual security. The price of shares in a mutual fund – the fund's net asset value – is determined entirely by the value of the assets in the fund's portfolio . . . . Thus, even if the fund misrepresented its investment policies and/or risk profile, those misrepresentations could not have caused plaintiffs' losses because the misrepresentations did not cause the decline in the value of the portfolio's asset holdings.
>
> \*          \*          \*
>
> Defendants' narrow formulation of loss causation would effectively insulate mutual fund companies from claims for a wide range of material misrepresentations regarding fund policies, risks and investment decisions. Defendants would immunize a scheme that purported to invest in low-risk government bonds but in fact invested in legitimate but high-risk treasure-hunting expeditions. Loss causation, however, is not limited to the common "corrective disclosure-price drop" scenario.
>
> As courts in other circuits have explained, a plaintiff may establish loss causation by alleging "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered;" that defendants' "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of" the security. *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173, 177 (2d Cir. 2005).
>
> \*          \*          \*
>
> Here, plaintiffs certainly alleged that the *subject* of the fraudulent statements caused their losses – that defendants misrepresented or failed to disclose portfolio risks, the materialization of which caused (or exacerbated) the losses. Similarly, if defendants misrepresented the scope of the fund's risks, and the undisclosed risks exacerbated the losses, then plaintiffs' resulting undervaluation of risks might be deemed to have caused some portion of their losses.

*Id.* [Emphasis in original.]

Accordingly, as in *Schwab*, Defendants' motion must be denied since "it is not apparent on the face of the complaint that plaintiffs c[an]not establish loss causation." *Id.* at *7.[14]

### H. Plaintiffs Adequately Allege that Defendants State Street, SSgA, Leahy, Ross, Swanson and the "Independent Trustees" Are Statutory Solicitors for the Purposes of Pleading a Section 12(a)(2) Claim

A Section 12(a)(2) claim may be brought against a defendant who "offers *or* sells a security." 15 U.S.C. §7l(2) (emphasis added). Potential liability under Section 12 is, therefore, not limited to those persons that actually pass title to the security. Rather, it extends to certain persons who engage in the solicitation of the sales. *Schwab*, 2009 WL 262456, at *8. More than twenty years ago, the U.S. Supreme Court set forth what is required for a person to be liable for solicitation:

> The person who gratuitously urges another to make a particular investment decision is not, in any meaningful sense, requesting value in exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale. . . . [L]iability extends only to the person who successfully solicits the purchase, motivated *at least in part* by a desire to serve his own financial interests *or those of the securities owner*.

*Pinter v. Dahl*, 486 U.S. 622, 647 (1988) (emphasis added); *see also Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) (extending the *Pinter* analysis to Section 12(a)(2) claims).

---

[14]   The cases cited by Defendants do not compel a different result. *Clark v. Nevis Capital Mgmt., LLC*, No. 04 Civ. 2702(RWS), 2005 WL 488641 (S.D.N.Y. March 2, 2005) and *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004) deal with alleged violations of the Securities Exchange Act of 1934, where loss causation is an element of the claim. In *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 591 (S.D.N.Y. 2006), the court found negative causation because the plaintiffs did "not allege[] even that they in fact lost money on their purchase of the mutual fund stock." Finally, *In re Merrill Lynch & Co., Research Reports Sec. Lit.*, 289 F. Supp. 2d 429 (S.D.N.Y. 2003) is factually distinct. In that case, the plaintiffs alleged that defendants violated the Securities Act by failing to disclose certain "conflicts of interest." *Id.* at 437. The court found that plaintiffs alleged no causal connection between the defendants' failure to disclose and the decline in the funds' price, which the court suggested was instead caused by the "internet bubble burst[ing] in the Spring of 2000." *Id.* at 431. Here, of course, the concealment of the true risks the Funds faced due to their investment in mortgage-related securities is tied directly to the drop in the Funds' NAVs.

Under Fed. R. Civ. P. 8(a), it is only necessary to plead a defendant's statutory solicitor status generally. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 (3d Cir. 1996). Indeed, earlier this year, the court in *Schwab* considered allegations that were strikingly similar to those made here and found that the plaintiffs had adequately alleged Section 12(a)(2) solicitor status as to the mutual fund defendants, including the Schwab funds' so-called "independent trustees." 2009 WL 262456, at *9.[15] The *Schwab* court found allegations that the individual defendants signed the registration statements, in combination with general averments that: "defendants were 'participants' in the distribution of the fund's shares; that defendants 'offered and sold' the funds shares; and that defendants 'actively solicited the sale of the fund's shares,'" and that individual defendants "'participated in the written or oral communications used to market the fund'" and "'participated in the marketing of the fund'"; were sufficient factual allegations that defendants solicited purchasers, motivated in part by a financial interest. *Id.* at *9.

Similarly, Plaintiffs here allege that Defendants Leahy, Ross, Swanson and the Independent Trustees signed the Registration Statements.[16] Compls. ¶¶11-20; *see Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) ("Although signing the registration statement need not constitute active solicitation . . . it is, at this stage of the proceedings, a sufficient allegation to permit Plaintiffs to present evidence that, alone or in tandem with other acts, the signatures

---

[15]    In *Schwab*, as in the present case, plaintiffs filed suit against several corporate and individual defendants for "misrepresenting the risk profile and assets" of the underlying fund. *Id.* at *1. Defendants challenged, among other things, the sufficiency of plaintiffs' allegations that the independent trustees on the board of Schwab Investments, which provided trust services and issued shares of the YieldPlus Fund, and other corporate directors were "sellers" under 12(a)(2). *Id.* at *9.

[16]    The "Independent Trustees" filed their own motion to dismiss Plaintiffs' Section 12(a)(2) claims. For simplicity sake, Plaintiffs are also responding to that motion herein.

constituted active solicitation").[17]  Plaintiffs further allege that Defendants: (i) "began offering shares" of the Yield Plus and Intermediate Funds "pursuant to an initial registration statement, filed with the SEC"; (ii) "marketed" the Yield Plus and Intermediate Funds; "issued and offered for sale shares of the Fund[s]"; (iii) were "sellers and offerors and/or solicitors of purchasers of the shares of" the Funds; and (iv) "participat[ed] in the preparation of the false and misleading Registration Statements." Yu Compl. ¶¶29, 33, 99, 100, 101; Plumbers Compl. ¶¶29, 33, 94, 95.  Moreover, each Independent Trustee had a position on the Board of Trustees of SSgA Funds.  Compls. ¶¶11, 13-15, 17, 19, 22.  As Board members, they were responsible for "overseeing generally the management, activities and affairs of each fund," and were "sellers and offerors and/or solicitors of purchasers of the shares of the Yield Plus Fund [and Intermediate Fund]."  Yu Compl. ¶¶9, 11, 13-15, 17, 19-22, 99; Plumbers Compl. ¶¶9, 11, 13-15, 17, 19-22, 94.  Each Independent Trustee was also a member of the Valuation Committee, which was directly responsible for – but failed to appropriately – "make fair value determinations as set forth in the SSgA Funds' Securities Valuation Procedures." Compls. ¶¶9, 22.  Accordingly, as in *Schwab*, Plaintiffs here have adequately pled that each of the Defendants passed title and/or solicited fund purchasers, motivated, at least in part, by a financial interest.[18]

---

[17]    Courts that have considered the issue have found allegations that a defendant signed a Registration Statement alone, or coupled with additional allegations (as is the case here), sufficient to state a Section 12(a)(2) claim.  *See Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) (finding the allegation that signing a registration statement "in itself is particularly 'significant for purposes of finding that a [person] is a seller'"); *Schwab*, 2009 WL 262456, at *10 (holding general averments of solicitor status and signing the registration statement sufficient to withstand motion to dismiss); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 456 (S.D.N.Y. 2005) (alleging signing registration statement alone sufficient for pleading purposes).

[18]    Contrary to Defendants' contention, "direct communication" between each Defendant and the purchasers is not required.  *Capri*, 856 F.2d at 478.  Defendants also cite inapposite cases decided at the summary judgment stage or at trial as authority for their motions to dismiss.  *See, e.g. In re Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 724 (S.D.N.Y. 1990); *Sellin v. Rx Plus, Inc.*, 730 F. Supp. 1289, 1293 (S.D.N.Y. 1990); *Royal Am. Managers, Inc. v. IRC Holding Corp.*,

Nonetheless, relying on a District Court opinion in *Vivendi*, the Independent Trustees claim

that Plaintiffs fail to allege they solicited sales while being motivated by their ***own*** financial interest.

*See Vivendi*, 381 F. Supp. 2d at 187.  Yet Defendants and the *Vivendi* court read *Pinter* much too

narrowly.  Under *Pinter*, Plaintiffs need only allege these defendants were motivated – in part – to

serve their own financial interests ***or the financial interest of the securities owner***.  *See Pinter*, 486

U.S. at 647; *see also In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 400 (S.D.N.Y. 2007)

(holding an implied, indirect financial benefit to defendant company sufficient to withstand motion

to dismiss); *In re Keegan Mgmt. Co. Sec. Litig.*, No. 91-20084 SW, 1991 WL 253003, at *8 (N.D.

Cal. Sept. 10, 1991) ("for plaintiffs to state a Section 12(2) claim . . . they [do] not have to allege that

the sale translated into an immediate increase in defendants' wealth").  Of course, there can be no

serious dispute as to whether the Independent Trustees' solicitations directly benefited State Street.

Compls. ¶¶6-9, 29, 30, 33.[19]

Even under the stringent holding in *Vivendi*, Plaintiffs adequately allege facts that create a

plausible claim that the Independent Trustees were motivated, at least in some part, by their own

financial interest.  *See Pinter*, 486 U.S. at 647.  Plaintiffs aver that each Independent Trustee had a

position on the Board of Trustees of SSgA Funds.  Compls. ¶¶11, 13-15, 17, 19, 22.  As members of

---

885 F.2d 1011, 1016-17 (2d Cir. 1989).  Finally, Defendants' reliance on *Mabon, Nugent & Co. v. Borey* is misplaced because the pleadings there were judged under the more stringent Rule 9(b), not Rule 8(a), which applies here.  127 B.R. 727, 735 (S.D.N.Y. 1991).

[19]    Allegations that corporate officials promoted a public offering that benefited the corporate issuer are generally sufficient to state a Section 12(a)(2) claim against the solicitors.  *See Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999); *In re Indep. Energy Holders PLC Sec. Litig.*, 154 F. Supp. 2d 741, 761 (S.D.N.Y. 2001) ("The allegation of financial gain . . . that these Individual Defendants stood to gain more than $30 million in capital from the Secondary Offering-is sufficient to meet the second prong"); *see also Flag Telecom*, 352 F. Supp. 2d at 456 (allegations that directors signed the registration statement containing materially false or misleading statements or omissions satisfy pleading requirements for Section 12(a)(2)).

the Board of Trustees, they were responsible for "overseeing generally the management, activities and affairs of each fund," signed the registration statements, were members of the Valuation Committee, and were "sellers and offerors and/or solicitors of purchasers of the shares of" the Yield Plus and Intermediate Funds.  Yu Compl. ¶¶9, 20, 22, 99; Plumbers Compl. ¶¶9, 20, 22, 94.  As Defendants themselves highlight, for this they were each paid approximately $140,000 per year.  *See* Skinner Decl. Ex. B at 20.  Thus, Defendants could not reasonably be said to have been "gratuitously urg[ing] another to make a particular investment decision," devoid of any financial motivation.  *See Pinter*, 486 U.S. at 647.  Instead, they had a real and substantial personal financial stake in the continuing, successful sale of Fund shares.[20]

## I.     Plaintiffs Have Pleaded Section 15 Control Person Claims

"[T]o plead control person liability under the Securities Act, it is sufficient to allege an underlying primary violation of the Securities Act and control over the controlled person."  *Indep. Energy*, 154 F. Supp. 2d at 770.  As detailed above, Plaintiffs have sufficiently alleged primary violations of Sections 11 and 12(a)(2) by all Defendants.  *See* Section III.B, *infra*.  Contrary to Defendants' charge, Plaintiffs have also alleged sufficient "control" by Leahy, Ross, Swanson, and the other Individual Defendants.

---

[20]     In any event, the foregoing analysis involves a factually-intense inquiry, not appropriate for resolution on a motion to dismiss.  *See Westinghouse*, 90 F.3d at 717 (finding allegations that defendants "'solicited plaintiffs' to purchase Westinghouse securities and that in so doing they were motivated by a desire to serve their own financial interests" were "factual allegations . . . not bare legal conclusions"); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1120 (D. Nev. 1998) ("[W]hether an individual is a seller under Section 12 is a question of fact, not properly decided on a motion to dismiss").

Plaintiffs allege that each of these Defendants was a "control person" and, among other things, signed a false and misleading Registration Statement.[21]  Yu Compl. ¶¶12, 16, 18, 106-07; Plumbers Compl. ¶¶12, 16, 18, 101-02.  As such, Plaintiffs sufficiently alleged each of these Defendants violated Section 15.  *Initial Public Offering Sec. Litig.,* 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) ("Section 15 claims need only be pleaded under Rule 8; a defendant is only entitled to notice that she allegedly controlled an entity that violated Section 11.").  Indeed, as signatories to the Registration Statements, these Defendants are presumed to have control over their contents. *See also In re WorldCom, Inc. Sec. Litig.,* 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003) (in denying defendants' motion to dismiss claims arising under §20 of the Securities Exchange Act of 1934, the court rhetorically asks: "just what is a signature on an SEC filed document meant to represent if it does not represent a degree of responsibility for the material contained in that document?"); *Schwab,* 2009 WL 262456, at *11 (in denying defendants motion to dismiss, court finds it is a "plausible inference, for example, that individuals who were officers of the fund . . . and who signed the registration statements were in a position to exercise power and control over Schwab Investments and/or the fund's portfolio managers, Daifotis and Hastings.").[22]

---

[21]     Plaintiffs similarly allege that Defendants Anderson, Marshall, Mastrovich, Riley, Shirk, Taber, and Todd each signed the Registration Statement and are thus liable under §15 for the misrepresentations contained therein.  Compls. ¶¶11, 13-15, 17, 19-20.

[22]     Other courts considering what facts demonstrate "control" for purposes of pleading violations of Section 15 have found allegations similar to those advanced by Plaintiffs in this case to be sufficient.  In *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463 (S.D.N.Y. 2004), the court found that individual defendants who served as officers of the company and signed its registration statement could be liable under Section 20 of the Securities Exchange Act as "control persons."  *Id.* at 485.  The court noted that "it 'comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report.'"  *Id.*

IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions

to dismiss in their entirety.

DATED:  April 6, 2009                    COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
                                         SAMUEL H. RUDMAN
                                         DAVID A. ROSENFELD
                                         EVAN J. KAUFMAN
                                         MARK T. MILLKEY


                                                  /s/ Evan J. Kaufman
                                         ————————————————————
                                              EVAN J. KAUFMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)

                                         *Attorneys for Lead Plaintiff Anatoly Alexander in
                                         the Yu Action and Attorneys for Lead Plaintiff
                                         Plumbers and Steamfitters Union Local No. 10
                                         Health & Welfare Fund in the Plumbers Action*

                                         DYER & BERENS LLP
                                         ROBERT J. DYER III
                                         JEFFREY A. BERENS
                                         682 Grant Street
                                         Denver, CO  80203
                                         Telephone: 303/861-1764
                                         303/395-0393 (fax)

                                         *Attorneys for Lead Plaintiff Anatoly Alexander in
                                         the Yu Action*

                                         HOLZER HOLZER & FISTEL, LLC
                                         COREY D. HOLZER
                                         MICHAEL I. FISTEL, JR.
                                         200 Ashford Center North, Suite 300
                                         Atlanta, Georgia 30338
                                         Telephone:  770/392-0090
                                         770/392-0029 (fax)

                                         *Additional Counsel in the Yu Action*

- 31 -

O'DONOGHUE & O'DONOGHUE LLP
CHARLES W. GILLIGAN
4748 Wisconsin Avenue, N.W.
Washington, DC  20016
Telephone:  202/362-0041
202/362-2640 (fax)

*Additional Counsel in the Plumbers Action*

<u>CERTIFICATE OF SERVICE</u>

I, Evan J. Kaufman, hereby certify that on April 6, 2009, I caused the foregoing Plaintiffs'

Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Class Action Securities

Complaints and Supporting Declaration of Evan J. Kaufman to be electronically filed with the Clerk

of the Court using the CM/ECF system, which will send notification of such public filing to all

counsel registered to receive such notice and by regular mail to the non-CM/ECF participants

indicated on the attached service list.


                                        */s/ Evan J. Kaufman*
                                        EVAN J. KAUFMAN

<u>Service List</u>

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
682 Grant Street
Denver, CO  80203
Telephone: 303/861-1764
303/395-0393 (fax)

O'DONOGHUE & O'DONOGHUE LLP
CHARLES W. GILLIGAN
4748 Wisconsin Avenue, N.W.
Washington, DC  20016
Telephone:  202/362-0041
202/362-2640 (fax)